**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

ALVIN PETERSON, DERRICK BONDS,
and LORENZO FORD,

                                            Plaintiffs,

                v.                                                                      No. 02-CV-1559
                                                                                              (LEK/DRH)

NORMA  PERYEA, ITS II, Clinton Correctional
Facility; SHARRON SANTERRE, Gen. Industrial
Training Supervisor, Clinton Correctional Facility;
PATRICIA SMITH, Senior Ind. Supt., Clinton
Correctional Facility; DANIEL SENKOWSKI,
Superintendent, Clinton Correctional Facility; GLENN
S. GOORD, Commissioner, NYS Dept. of Correctional
Services; JAMES T. HOFFMAN, Asst. Dir. for Admin.,
 Corcraft Products; and JOHN W. CONROY, Director,
Corcraft Products,

                                            Defendants.
_____

**APPEARANCES:**                                    **OF COUNSEL:**

ALVIN PETERSON
Plaintiff Pro Se
c/o Weston United
2262 Adam Clayton Powell, Jr. Boulevard
New York, New York 10030

DERRICK BONDS
No. 95-A-7840
Plaintiff Pro Se
Coxsackie Correctional Facility
Post Office Box 999
Coxsackie, New York 12051-0999

LORENZO FORD
No. 01-B-1500
Plaintiff Pro Se
Clinton Correctional Facility
Post Office Box 2001
Dannemora, New York 12929-2001

HON. ELIOT SPITZER                      BRIDGET E. HOLOHAN, ESQ.
Attorney General for the                Assistant Attorney General
  State of New York
Attorney for Defendants
Department of Law
The Capitol
Albany, New York 12224-0341

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

Plaintiff pro se Alvin Peterson ("Peterson"), formerly an inmate in the custody of the New York State Department of Correctional Services (DOCS), and plaintiffs pro se Derrick Bonds ("Bonds") and Lorenzo Ford ("Ford"), currently inmates in the custody of DOCS, bring this action pursuant to 42 U.S.C. § 1983. Plaintiffs contend that defendants, seven DOCS officials and employees, violated their constitutional rights under the Eighth and Fourteenth Amendments.[2] Am. Compl. (Docket No. 37).  Presently pending is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56(b). Docket No. 101. Plaintiffs have not responded to the motion. For the following reasons, it is recommended that defendants' motion be granted.

### I. Background

Plaintiffs' amended complaint concerns events occurring at Clinton Correctional

---

[1] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

[2] An eighth defendant, Randy Sears, was previously dismissed from this action. Docket No. 107. In addition, claims brought pursuant to 5 U.S.C. §§ 552 and 552(a) were dismissed on February 22, 2005. Docket No. 107.

Facility ("Clinton") and the DOCS Corcraft Industrial Program in which inmates learned trade skills for pay while manufacturing clothing and other items for use in the DOCS system. On November 27, 2001, Peterson, who is African-American, was assigned to the Tailor Shop-3 program.   Due to good performance, he received pay increases in January and March, 2002 and eventually received a grade 3.2 pay rate. Peryea Decl. (Docket No. 101) at ¶¶ 3-5; Holohan Affirm. (Docket No. 101) at Ex. A. In March 2002, Peterson assumed duties as an issue clerk, a key position in Tailor Shop-3, and remained at a grade 3.2 pay rate. Peryea Decl. at ¶ 8. On September 9,  2002, when a grade 4.0 pay rate became available, Peryea gave the pay increase to Joseph Moss, who was white. Peryea Decl. at ¶ 9.

On September 16, 2002, Clinton conducted a facility-wide frisk. Peryea Decl at ¶¶ 10-13. In the Tailor Shop-3, materials were found in the issue clerk cage that did not belong there and cushions were confiscated because they posed a security risk due to misuse by inmates taping or wrapping cushions around the chairs. Id. at ¶ 10. As issue clerk, Peterson was responsible for materials found in the issue clerk cage and as a result of the unauthorized materials found there, Peterson was reassigned to another position. Id. at ¶¶ 10-13. Peterson continued to receive a grade 3.2 pay rate. Id. at ¶ 13. On September 17, 2002,  Moss assumed the position of issue clerk.  Peryea Decl. at ¶ 9.

Peterson filed grievances dated September 20 and 24, 2002 complaining that Peryea  removed him from the issue clerk position and that the new issue clerk was receiving grade 4 pay while he had received grade 3.2 pay while in that position. Id. at ¶ 12; Artus Decl. (Docket No. 101) at ¶ 5. On October 28, 2002, due to poor performance evaluations, Peterson's pay rate was decreased from a grade 3.2 pay rate of thirty-five

3

cents an hour to a grade 2.2 pay rate of twenty-nine cents an hour. Peryea Decl. at ¶¶ 35-37.[3]  On December 15, 2002, Peterson's pay rate was returned to a grade 3.2 pay rate. Holohan Affirm. at Ex. A.

Bonds, also African-American, was assigned to the Tailor Shop-3 program on August 3, 2000. Peryea Decl. at ¶ 15; Holohan Affirm. at Ex. B.  Bonds received a total of four pay increases and effective August 19, 2002, his rate was a grade 4. Peryea Decl. at ¶ 17.  In September 2002, Bonds filed complaints alleging unequal treatment, retaliation, and removal of chair cushions in the Tailor Shop-3. Artus Decl. at Exs. J, K.  In April, September, and October, 2002, Bonds received several warnings for poor production, poor attitude, and harassing remarks. Peryea Decl. at ¶¶ 17, 20 & Ex. F; Droulette Decl. (Docket No. 101) at Ex. A.  After the October 23, 2002 counseling notification, Bonds became verbally hostile and was referred to the Program Committee to determine if he should be reassigned. Peryea Decl. at ¶ 20.  On November 10, 2002, Bond was removed from the Tailor Shop-3 program. Holohan Affirm. at Ex. B.

Ford, also African-American, was assigned to the Tailor Shop-3 program on March 14, 2002. Holohan Affirm. at Ex. C.  Ford received a total of three pay increases up to a grade 3.2. Id.  On September 30, 2002,  Ford testified at another inmate's disciplinary hearing and was given a new position within Tailor Shop-3 with the same pay rate but claims he could not perform the duties as well as his former duties. Am. Compl. at ¶¶ 37. This action followed.

---

[3]Grade 4 paid approximately forty-five cents an hour.  Peryea Decl. at ¶ 7.

## II. Discussion

## A. Motion for Summary Judgment Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Facts are material if they may affect the outcome of the case as determined by substantive law.  Anderson v. Liberty Lobby, 477 U.S. 242, 250 (1986).  All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.  Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude.  Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).[4]  However, "the mere existence of some alleged factual dispute between

---

[4] Although entitled to such solicitude, Peterson has prior litigation experience, having filed at least eight other federal actions since 1995. See  U.S. Party/Case Index

5

the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Defendants' notice of motion warned plaintiffs that failure to respond to their motion by setting forth specific facts demonstrating a genuine issue of fact would result in this Court treating the facts asserted by defendants as true and that the motion might be granted absent a response.  Docket No. 101.  Plaintiffs were twice granted extensions to respond to the motion.  Docket Nos. 105, 106.  Nevertheless, plaintiffs have failed to respond.

"The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically."  Champion v. Artuz, 76 F.3d 483, 486 (2d Cir. 1996).  Even in the absence of a response, defendants are entitled to summary judgment only if the material facts demonstrate their entitlement to judgment as a matter of law.  Id.; Fed. R. Civ. P. 56(c).  Because plaintiffs have not responded to raise any question of material fact, however, the facts as set forth in defendants' Rule 7.1 Statement of Fact and affidavits (Docket No. 101) are accepted as true.  Adirondack Cycle & Marine, Inc. v. American Honda Motor Co., Inc., No. 00-CV-1619; 2002 WL 449757, at *1 (N.D.N.Y. Mar. 18, 2002) (McAvoy, J.) (citing Lopez v. Reynolds, 998 F. Supp. 252, 256 (W.D.N.Y. 1997)).

_____

(visited July 12, 2005) <http://pacer.uspci.uscourts.gov/cgi-bin/ dquery.pl>. It does not appear that Bonds and Ford have not filed any other federal actions in New York.

6

**B. Exhaustion**

Defendants contend that Peterson has failed to exhaust his administrative remedies regarding his claim that defendant Peryea reduced his pay rate in retaliation for filing grievances. Defendants also contend that Bond and Ford failed to exhaust their administrative remedies regarding all claims alleged in the amended complaint.

Under 42 U.S.C. § 1997e(a), an inmate must exhaust all administrative remedies prior to bringing a §1983 lawsuit. <u>Porter v. Nussle</u>, 534 U.S. 516, 524 (2002). This exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes. <u>Id.</u> at 532. "[A]ny deprivation that does not affect the fact or duration of a prisoner's overall confinement is necessarily a condition of that confinement." <u>Jenkins v. Haubert</u>, 179 F.3d 19, 28 (2d Cir. 1999). Conditions of confinement include deprivations of "exercise, medical care, adequate food and shelter, and other conditions that, if improperly imposed, could violate the Constitution." <u>Id.</u> at 28. The exhaustion requirement also applies even if the administrative grievance process does not provide for all the relief requested by the inmate. <u>Nussle</u>, 534 U.S. at 524.

DOCS has instituted an inmate grievance program which provides inmates with a method of resolving grievances. N.Y. Comp. Codes R. & Regs. tit. 7, § 701.1 (2005). A grievance is defined therein as a "complaint about the substance or application of any written or unwritten policy, regulation, procedure or rule of [DOCS] or any of its program units, or the lack of a policy, regulation, procedure or rule." <u>Id.</u> at § 701.2(a) (2005). An inmate must first bring his or her grievance to the Inmate Grievance Review Committee (IGRC). <u>Id.</u> at § 701.7(a). If denied by IGRC, the inmate may appeal to the facility superintendent. <u>Id.</u> at § 701.7(b). If the superintendent denies relief, the inmate may take

7

a final appeal to the Central Office Review Committee (CORC). Id.   at § 701.7(c).  Thus, if a plaintiff has failed to follow each step, he has failed to exhaust his administrative remedies as required by § 1997e(a).

A three-part inquiry is appropriate in cases where a prisoner plausibly seeks to counter a contention that he or she has not exhausted available administrative remedies under §1997e(a).  Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004).  First, a court must determine whether the administrative remedies were actually "available" to the petitioner.  Id. (citing Abney v. McGinnis, 380 F.3d 663, 667 (2d Cir. 2004)).  "Availability" means more than the mere presence of a grievance system, but that a "similarly situated individual of ordinary firmness" would have deemed it available.  Hemphill, 380 F.3d at 688 (citing Davis v. Goord, 320 F.3d 346, 353 (2d Cir. 2003)).

The second part of the inquiry requires a court to ask whether a defendant's actions inhibited exhaustion so that the defendant is estopped from raising it as a defense. Hemphill, 380 F.3d at 686 (citing Ziemba v. Wezner, 336 F.3d 161,163 (2d Cir. 2004)). Finally, a court should also consider whether any "special circumstances" were plausibly alleged to justify the petitioner's failure to comply with the administrative requirements. Hemphill, 380 F.3d at 686; Giano v. Goord, 380 F.3d 670, 672 (citing Berry v. Kerik, 336 F.3d 85, 87-88 (2d Cir. 2004)).

Defendants contend that Peterson failed to exhaust his administrative remedies regarding his retaliation claim against Peryea. On October 23, 2002, Peterson filed grievance 47297-02 complaining that Peryea lowered his pay grade in retaliation for filing a grievance and for requesting to be removed from the overtime list. Brousseau Aff. (Docket No. 101) at Ex. B.  After an investigation, it was determined that Peterson's pay

8

was decreased properly and the grievance was denied. Other inmates in the same position were producing significantly more work. Id.  Peterson did not appeal this grievance to the CORC. Peterson provides no reason why the appeal was not otherwise "available" to him or if he believed that this was a favorable response. Therefore, Peterson failed to exhaust his administrative remedies regarding his claim that Peryea reduced his pay rate in retaliation for filing a grievance.

Defendants contend that Bond failed to exhaust his administrative remedies regarding all claims alleged in the complaint.  On September 20, 2002, Bonds filed grievance 47081-02 complaining that the chair cushions were removed from Tailor Shop-3 and requesting that the cushions be replaced. Brousseau Decl. at Ex. E.  The IGRC denied the grievance and noted that the cushions were provided as a courtesy, were confiscated due to misuse, and would be replaced as soon as material was available. Id. The superintendent affirmed the IGRC response and  Bonds did not appeal to the CORC. Id.  Bond fails to demonstrate that he believed an appeal was not "available" or that his relief was otherwise granted.  Bonds filed no other grievances regarding the claims contained in the amended complaint, and, therefore, failed to exhaust his administrative remedies as to all claims.

Ford did not file any grievances regarding the claims made here. While Ford contends that he wrote letters to the Commissioner and superintendent, this is not sufficient under the PLRA to exhaust administrative remedies as the DOCS grievance program was not used. Ford fails to demonstrate that he believed an administrative remedy was not "available" and, therefore, failed to exhaust his administrative remedies as to all claims.

9

It is therefore recommended that defendants' motion on this ground be granted as to Peterson's claim that Peryea reduced his pay rate in retaliation for filing grievances and as to all claims asserted by Bonds and Ford.

### C. Personal Involvement

Defendants contend that plaintiffs have failed to establish the personal involvement of Goord, Hoffman, Conroy, Senkowski, and Smith.

To establish liability under § 1983, a plaintiff must demonstrate that the alleged deprivation of federal rights was committed by a person acting under "color of state law." 42 U.S.C. § 1983; West v. Atkins, 487 U.S. 42, 48-49 (1988).  A prerequisite to establishing this liability is the personal involvement of the defendants in the alleged deprivation. Generally, liability cannot be imposed on a state official for damages under § 1983 solely by the fact that he is a supervisor because respondeat superior liability does not exist under § 1983. Blyden v. Mancusi, 186 F.3d 252, 264 (2d Cir. 1999).  However, a defendant supervisor is personally involved if he or she has (1) directly participated in the infraction, (2) failed to remedy the wrong after learning of the violation, (3) created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue, or (4) was grossly negligent in managing subordinates who caused the unlawful condition or event. Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986).

Here, plaintiffs allege that Goord violated their constitutional rights by failing to stop discrimination in the Tailor Shop-3, allowed retaliation to continue, and was grossly negligent in his supervision of the work program. All letters of complaint sent to Goord were referred to other DOCS employees and Goord himself did not respond. Artus Decl.

10

at Exs. G, H, K, N, P. Plaintiffs fail to show that Goord was otherwise personally involved or had notice of any alleged violation. Plaintiffs also fail to show that defendant Conroy was personally involved. Conroy was the Director of Corcraft, the trade name of DOCS Division of Correctional Industries, which oversaw the manufacturing program in the DOCS facilities. Hoffman Decl. (Docket No. 101) at ¶¶ 2, 5.  Conroy retired prior to receipt of Peterson's letters complaining of unequal treatment in Tailor Shop-3 and was thus unaware of any alleged violations. Id. at ¶¶ 4, 5.  Therefore, plaintiffs fail to show how Conroy was aware of the alleged violations or was otherwise personally involved.

Defendant Hoffman was Director of Corcraft and responded to Peterson's letter dated October 30, 2002 complaining of retaliatory and discriminatory treatment in the Tailor Shop-3. Hoffman Decl. at Exs. A, B.  While Hoffman may have had notice of an alleged constitutional violation, plaintiffs fail to demonstrate that  he then demonstrated "gross negligence" or "deliberate indifference" by failing to act. McCann v. Coughlin, 698 F.2d 112, 125 (2d Cir. 1983).  Hoffman investigated Peterson's complaints and determined that  DOCS's investigation and subsequent denial of Peterson's grievance revealed that no further investigation was required by Corcraft. Hoffman Decl. at Ex. B; Brousseau Decl. at Ex. B.  Hoffman's actions in relying on DOCS' decision does not rise to the level of gross negligence or deliberate indifference and was a reasonable response. In addition, Hoffman did not receive any complaints from Bonds or Ford and all plaintiffs thus fail to establish how Hoffman was otherwise personally involved.

Defendant Senkowski, who was Superintendent of Clinton during the time period in question, received letters from Peterson, Bonds, and Ford complaining of retaliation and discrimination in Tailor Shop-3. Artus Decl. at Exs. A, C, D, J, M.  In response to these

11

letters, Senkowski returned a brief memorandum explaining that they were forwarded to Dale Artus, the Deputy Superintendent, for review and appropriate action. Id. at Ex. C. This brief response does not demonstrate that Senkowski was aware of any of the allegations contained in the letters. In addition, the appeal of any grievance to the Superintendent is not sufficient to show the personal involvement of the Superintendent. Gill v. Mooney, 824 F.2d 192, 196 (2d Cir. 1987).

Senkowski referred one of each plaintiff's letters of complaint to defendant Smith, who referred them in turn to defendant Santerre for investigation. Artus Decl. at Exs. D, J, N. Santerre investigated the complaints, which included interviews, and reported the results to Smith. There is no record of what action Smith took once the results of the investigation were reported to her. This is sufficient to raise a question of material fact as to whether Smith had knowledge of the alleged violation and whether she attempted to remedy the wrong after learning of the allegations.

It is recommended that defendants' motion on this ground be granted as to Goord, Conroy, Hoffman, and Senkowski and denied as to Smith.


**D. Equal Protection**

Plaintiffs contend that they were treated differently than white inmates in pay increases, promotions, and working conditions. Defendants contend that plaintiffs fail to establish that they were treated differently solely based upon race.

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law.  Essential to that protection is the guarantee that the government treat all

12

similarly situated persons equally.  City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985); Harlen Assocs. v. Village of Mineola, 273 F.3d 494, 499 (2d Cir. 2001). "In order to establish an equal protection violation, the plaintiffs must show that they were treated differently than other people in similar circumstances and must establish that such unequal treatment was the result of intentional and purposeful discrimination."  Myers v. Barrett, No. 95-CV-1534, 1997 WL 151770, at *3 (N.D.N.Y. Mar. 28, 1997) (Pooler, J.).

   "[D]isparate racial impact alone will not support a finding of a violation of the equal protection clause." Castaneda v. Partida, 430 U.S. 482, 493 (1977).  Plaintiffs must prove not only discriminatory effect, but that a discriminatory purpose was a "motivating factor" in the administrative decision. Washington v. Davis, 426 U.S. 229, 239 (1976); Arlington Heights v. Metropolitain Hous. Dev. Corp., 429 U.S. 252, 264-65 (1977).  Moreover, a "person bringing an action under the Equal Protection Clause must show intentional discrimination against him because of his membership in a particular class, not merely that he was treated unfairly as an individual." Huebschen v. Dep't of Health & Social Services, 716 F.2d 1167, 1171 (7th Cir. 1983); Santiago v. Miles, 774 F. Supp. 775, 797 (W. D.N.Y. 1991).

   Plaintiffs contend that white inmates received pay grade increases, promotions, and preferable assignments. Defendants contend that there is no disparity between white and African-American inmates in the pay rate and positions in Tailor Shop-3.

   Peterson alleges that a white inmate, Joseph Moss, made grade 4 pay while working at a job which required less skill while Peterson was entitled to grade 4 pay while he was in the key position of issue clerk. Peterson also alleges that Moss was given a pay increase because he was white while Peterson was denied an increase because he was

13

African-American. Defendants contend that pay grades were not established for specific jobs and that pay increases were based on seniority, performance, educational level, and the availability of grade rate positions. Smith Decl. at ¶ 5; Peryea Decl. at ¶ 6.

Peterson, who had been in the shop since November 27, 2001, was moved to the position of issue clerk, a key position in Tailor Shop-3, in March 2002 at a grade 3.2 pay rate. Peterson did not receive an increase when moved to this position. Holohan Affirm. at Ex. A.  In March and September, 2002, Peterson received positive performance reviews, however, Peterson had not learned how to sew. Peryea Decl. at Exs. B, C.  Peterson requested an increase to a grade 4 pay rate several times, but only eleven inmates within Tailor Shop-3 could receive grade 4 pay at one time. Peryea Decl. at ¶ 7.  In September 2002, a grade 4 pay slot became available and Peryea awarded the increase to Moss.  Id. at ¶ 9; Holohan Affirm. at Ex. D. Moss had been in the shop since November 26, 2001, received positive, above-average performance reviews, and knew how to sew. Peryea Decl. at ¶¶ 8-9 & Ex. D.  Defendants contend that Moss was given an increase and moved to issue clerk because he had seniority, was able to sew, and due to his performance. Defendants' assertions have not been contradicted by plaintiffs and should, therefore, be accepted.  Defendants thus sufficiently demonstrate that race was not a motivating factor in Moss' grade increase and that Peryea's decision to give the grade increase to Moss was based on factors other than race.

In support of their contention that pay rates were not made on the basis of race, defendants also offer evidence that of the eighteen inmates receiving grade 4 or 5 pay, seven were African-American, five were white, and six were Hispanic. Smith Decl at Ex. B. Defendants also show that there were several white inmates that never received grade 4

14

pay despite the length of their time in Tailor Shop-3. Holohan Affirm. at Exs. G-R.  In

addition, defendants offer specific statistics that the allocation of pay rate among inmates

assigned to Tailor Shop-3 was not based on race. See Smith Decl. at Exs. B, J, K, L, D, G,

M.  Defendants sufficiently demonstrate that race was not a motivating factor in the

allocation of pay rates.

On September 16, 2002, during a facility-wide frisk, there was shirt material found

in the issue clerk cage that did not belong there. Peterson, as issue clerk, was solely

responsible for the contents of the cage and as a result was reassigned to another

position for which he received the same grade 3.2 pay rate.  Moss replaced Peterson as

issue clerk on September 17, 2002. Peryea Decl. at ¶ 9.  Defendants contend that

Peterson was removed from the issue clerk position and was replaced with Moss because

of the contraband found on September 16, 2002.  Defendants sufficiently show without

contradiction that job assignments were based on performance, availability, the need to

cross-train and to fill in all positions as quickly as possible to maintain production

deadlines. Id. at ¶¶ 25-28.

Bonds' claim that he was discriminated against as to pay increases fails as he

received grade 4 pay since May 7, 2001. Holohan Affirm. at Ex. B.  On November 10,

2002, Bonds was removed from the Tailor Shop-3 program for poor attendance,

participation, or progress. Id.  The decision to remove Bonds from this program for this

reason is supported by the negative performance reviews and counseling notifications.

Droulette Decl. at Exs. A, F. The program committee made the decision to terminate

Bonds from the program based on these reviews and notifications, not based on race.

Bonds also contends that a white inmate, Goodrich, received a pay increase faster than Bonds and was promoted to shop instructor because he was white. Holohan Affirm. at Ex. AA. Goodrich started in Tailor Shop-3 on April 9, 2001, made grade 4 on August 12, 2002, and became shop instructor on April 14, 2003. Holohan Affirm. at Ex. D. However, Goodrich started on April 2001 and Bonds started in August 2002. Therefore, Goodrich had seniority over Bonds, thereby explaining without contradiction that the promotion was not based on race.

Plaintiffs contend that African-American inmates were required to perform multiple duties and work harder in order to receive grade 4 pay. However, plaintiffs fail to support this contention. Defendants contend that all inmates received different assignments to increase production and that all grade 4 inmates performed different assignments. Defendants show without contradiction that both African-American and white inmates occupied different positions in Tailor Shop-3 and that inmates were moved to different assignments based on the needs of the shop and the need to meet production deadlines. Peryea Decl. at ¶¶ 25-27. If an inmate was proficient in one area, that inmate was more likely to remain in that particular assignment to facilitate efficiency and production deadlines.

Defendants are able to demonstrate that the working conditions for both white and African-American inmates were the same and that plaintiffs were not treated any differently due to race. All of the chair cushions were removed from the shop due to legitimate security concerns as the inmates were improperly taping the cushions to chairs, constituting a security risk. Defendants demonstrated without contradiction that any difference in pay rates and treatment were based on performance, seniority, misconduct,

16

and factors other than race. Plaintiffs fail to prove racially discriminatory intent or purpose required to show a violation of the Equal Protection Clause. Arlington Heights, 429 U.S. at 265.

It is therefore recommended that the defendants' motion on this ground be granted in all respects.

### E. Eighth Amendment

Bonds contends that defendants' refusal to provide him with a cushion during work hours violated his Eighth Amendment rights. Defendants contend that Bonds' allegation does not rise to the level of a constitutional violation.

The Eighth Amendment is made applicable to the states through the Due Process Clause of the Fourteenth Amendment. Cooper Industries Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 433-34 (2001). It prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. The Eighth Amendment also imposes a duty upon prison officials "to take reasonable measures to guarantee the safety of the inmates themselves." Hudson v. Palmer, 468 U.S. 517, 526-27 (1984). To establish an Eighth Amendment claim based on unsafe working conditions, "a plaintiff must establish that 1) he [or she] was incarcerated under conditions which posed a serious risk of serious harm, and 2) prison officials acted with deliberate indifference to his [or her] health or safety." See Farmer, 511 U.S. at 834; Howard v. Headly, 72 F. Supp. 2d 118, 123 (E.D.N.Y. 1999)

While the Eighth Amendment's prohibition against cruel and unusual punishment "does not mandate comfortable prisons," Rhodes v. Chapman, 452 U.S. 337, 349 (1981), the conditions of confinement must be at least "humane." Farmer, 511 U.S. at 832. "[A]

17

prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." Hayes v. New York City Dep't of Corrections, 84 F.3d 614, 620 (2d Cir. 1996).  A plaintiff can demonstrate deliberate indifference by evidence that "a substantial risk [to inmate health and safety] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official . . . had been exposed to information concerning the risk and thus 'must have known' about it . . . ." Farmer, 511 U.S. at 842-43.

On September 16, 2002, the chair cushions in Tailor Shop-3 were removed because they were taped to chairs, thus causing a security risk that inmates might hide weapons under the cushions. Plaintiffs do not demonstrate that this deprivation was "sufficiently serious" to warrant Eighth Amendment protection. Work hours at the shop were four days a week for seven hours per day, and the cushions were replaced in two months. Further, neither Bonds nor any other inmate assigned to Tailor Shop-3 sought medical attention as a result of the removal of the cushions. Moreover, there is no basis for finding "cruel and unusual punishment" where inmates challenge work conditions but choose to continue working under those conditions. Helling v. McKinney, 509 U.S. 25, 35 (1993). There is no showing in the record that Bonds or other inmates requested a transfer to another program due to these conditions.

In addition, defendants show that they removed the cushions for legitimate security concerns and the cushions were replaced after they had been repaired. See Peryea Decl. at ¶ 10; Brousseau Decl. at Ex. E.  Inmates had been warned about the consequences of misuse of the chair cushions. Peryea Decl. at ¶ 10. These actions demonstrate that

defendants' actions in removing the cushions were not deliberately  indifferent to plaintiffs' health or safety.

Therefore, defendants motion on this ground should be granted.


## F. Grievances

Peterson and Bonds contend that defendant Santerre failed to investigate their complaints and therefore violated their constitutional rights. Defendants contend that these claims fail to state a cause of action.

An inmate has a First Amendment right to meaningful access to the courts and to petition the government for the redress of grievances. Bill Johnson's Rest., Inc. v. NLRB, 461 U.S. 731, 741 (1983).  However, state inmate grievance procedures are not required by the Constitution and violations of these procedures do not give rise to a cognizable § 1983 claim. Cancel v. Goord, No. 00 Civ. 2042, 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001). If prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of that claim. Flick v. Alba, 932 F.2d 728, 729 (8th Cir.1991). "[R]efusal to process an inmate's grievance or failure to see to it that grievances are properly processed does not create a claim under § 1983." Shell v. Brezniak, 365 F. Supp. 2d 362, 369-70 (W.D.N.Y. 2005).

Moreover, while the filing of grievances and complaints are constitutionally protected, the manner in which investigations into the subject of the grievance or complaint is conducted does not create a constitutional claim.  Buckley v. Barlow, 997 F.2d 494, 495 (8th Cir. 1993); Torres v. Mazzuca, 246 F. Supp. 2d 334, 342 (S.D.N.Y. 2003). "Prison grievance procedures do not confer any substantive right upon an inmate

requiring the procedural protections envisioned by the Fourteenth Amendment." Torres,

246 F. Supp. 2d at 342;  Mahotep v. Deluca, 3 F. Supp. 2d 385, 390 n.3 (W.D.N.Y. 1998).

    Plaintiffs allege that Santerre refused to investigate their complaints. Any

allegations by plaintiffs regarding a failure of Santerre in investigating complaints or

grievances do not implicate any constitutional right. See Williams v. Goord, 111 F. Supp.

2d 280, 288 (S.D.N.Y. 2000).  In fact, defendants show that Santerre did in fact investigate

these complaints and interviewed both Bonds and Ford. Artus Decl. at Exs. D, J, N.

Santerre reported the results to Smith. Id.  Therefore, plaintiffs fail to show how Santerre's

actions violated their constitutional rights and fail to state a cognizable claim.

    It is recommended that defendants' motion as to this claim be granted.


### G. Retaliation

    Plaintiffs contend that they were retaliated against for filing grievances and

complaints. Defendants contend that plaintiffs fail to establish a claim for retaliation.

    In order establish a retaliation claim, a plaintiff must first allege that the plaintiff's

conduct was constitutionally protected and that this conduct was a "substantial factor" that

caused the adverse action against plaintiff. Dawes v. Walker, 239 F.3d 489, 492 (2d. Cir.

2001). The burden then shifts to the defendant to show that by a preponderance of the

evidence, the adverse action would have resulted even in the absence of the protected

conduct. Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).

Retaliation claims are actionable because they may tend to chill an individual's exercise of

constitutional rights. Dawes, 239 F.3d at 491. However, courts must view retaliation claims

with care and skepticism to avoid judicial intrusion into prison administration matters. Id.
Peterson contends that when he filed a grievance complaining that he did not receive a
pay increase, Peryea displayed animosity, implied that Peterson had to perform multiple
duties in order to receive a pay increase, and removed Peterson from his assignment as
issue clerk.  It is well-settled that filing a grievance is a protected activity. Morales v.
Mackalm, 278 F.3d 126, 131 (2d Cir. 2002).  In addition, there is support for the
proposition that a pay decrease and being terminated from a prison program job may
constitute adverse action. Walker v. Pataro, No. 99CIV4609 (GBD/AJP), 2002 WL
664040, at *8 (S.D.N.Y. Apr. 23,2002); Van Pelt v. Finn, No. 92 Civ. 2977, 1993 WL
465297 at *4-5 (S.D.N.Y. Nov. 12, 1993); Baker v. Zlochowon, 741 F. Supp. 436, 439-40
(S.D.N.Y. June 29, 1990).  However, verbal harassment and the implication that Peterson
would have to perform more than other inmates to receive a pay increase are de minimis
and do not rise to the level of adverse action.  Rivera v. Goord, 119 F. Supp. 2d 327, 339-
40 (S.D.N.Y.2000).

Regardless, Peterson fails to show a causal connection between the protected
activity and the pay decrease and removal from the issue clerk position because the
protected activity occurred after the adverse action.  Peterson was removed from the issue
clerk position on September 16, 2002, prior to the filing of his grievance on September 25,
2002. Peterson's grievance was filed on October 25, 2002, after  Peryea gave him an
unsatisfactory performance evaluation on October 23, 2002.

Bonds contends that when he filed a grievance on September 20, 2002
complaining of removal of chair cushions, he was assigned to more demanding jobs within
Tailor Shop-3. However, Bonds pay grade remained the same and Bonds fails to support

this contention with any evidence other than his conclusory statement that the new assignment was more demanding. In addition, Bonds alleges that when he filed a complaint with Senkowski and Goord on September 25 and 29, 2002, he was terminated from his program assignment on November 10, 2002.  There was over a month between Bonds' complaints and his termination from the program.  In addition, defendants demonstrate without contradiction that Bonds would have been removed from the program regardless of filing grievances.  Bonds received poor performance reviews on April 30 and October 15 and 23, 2002. Droulette Decl. at Ex. A; Holohan Affirm at Ex. B.

Ford contends that he was given a new job position in retaliation for giving testimony at a disciplinary hearing.  However, while Ford was given a new position, his pay remained the same, he was not given a decrease in a grade, and in effect remained at that position until April 27, 2003. Holohan Affirm. at Ex. C. This does not constitute adverse action and, therefore, Ford cannot show that a new position within the same program was in retaliation for any protected activity.

It is recommended that defendants' motion for summary judgement be granted as to all defendants' on plaintiffs' retaliation claims.


**H. Qualified Immunity**

Finally, defendants contend that they are entitled to qualified immunity.  Qualified immunity generally protects governmental officials from civil liability insofar as their conduct does not violate clearly established constitutional law of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F. Supp. 2d 211, 229 (N.D.N.Y. 2002) (McAvoy, J.), aff'd, 80 Fed.Appx. 146 (2d Cir.

22

2003).  A court must first determine that if plaintiff's allegations are accepted as true, there would be a constitutional violation. Only if there is a constitutional violation does a court proceed to determine whether the constitutional  rights were clearly established at the time of the alleged violation. Aiken, 236 F. Supp. 2d at 230. Here, the second prong, of the inquiry need not be reached because, as discussed supra, accepting all of plaintiffs' allegations as true, they have not shown a constitutional violation.

Therefore, defendants' motion for summary judgment on this alternative ground should be granted.


### III.  Conclusion

For the reasons stated above, it is hereby

**RECOMMENDED** that defendants' motion for summary judgment  (Docket No. 101)  be **GRANTED** as to all claims and all defendants.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of Health & Human Servs., 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


DATED:  August 19, 2005
        Albany, New York

David R. Homer

United States Magistrate Judge